J-S01029-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: F.J.T., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF F.T., NATURAL FATHER | |
| | No. 1196 WDA 2014 |

Appeal from the Order June 26, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CYS 025 OF 2011

BEFORE: GANTMAN, P.J., JENKINS, J., and MUSMANNO, J.

MEMORANDUM BY JENKINS, J.:                    **FILED JULY 29, 2015**

Appellant F.T. ("Father") appeals from the order entered in the Allegheny County Court of Common Pleas that terminated his parental rights to his natural son, F.J.T. ("Child"), born November, 2006.[1] We affirm.

The relevant facts and procedural history of this appeal are as follows. Father and A.T. ("Mother") are the natural parents of five daughters and one

_____

[1] The June 26, 2014 order also terminated the parental rights of Child's natural mother ("Mother"), who did not file an appeal, and of Child's unknown father. Although paternity is not contested in this case, it seems the court terminated the rights to any unknown father so that Child could be adopted.

son, Child.[2]  The Allegheny County Office of Children, Youth and Families ("CYF") first became involved with this family in 1991 after reports that Mother had thrown her oldest daughter.  After twenty-four (24) additional reports of abuse, in which Mother allegedly threw and punched her daughters, beat them with spatulas, batons, hairbrushes, belts and extension cords, forced them to eat feces, and verbally abused them with racial slurs, the court ordered that Mother was to have no contact with her children on July 18, 2005.  On March 23, 2006, the court terminated Mother and Father's parental rights to all of the daughters.[3]  The same day, the court ordered Mother not to have any contact with any children under the age of eighteen (18).

Child was born in November, 2006.  On September 27, 2007, CYS received a report that Child was living with Mother and removed Child.  After a hearing, Child was returned to Father on October 1, 2008, and Father understood that he was not to permit Mother to have any contact with Child.  CYS closed the file on the case on May 27, 2009.  On August 24, 2009, CYS

_____

[2] When Father married Mother in 1990, she was pregnant with another man's child.  Father was the legal parent of this child.  Additionally, the five natural daughters of Mother and Father were born October, 1992, August, 1997, September, 1998, October, 2001, and November, 2002, respectively.

[3] Although most of the children claimed Father did not physically abuse them, two of the daughters alleged Father had pinched them on the nipple until it bled.  In addition to abusing the daughters, Mother allegedly abused her nieces and stabbed Father with a kitchen knife because she suspected him of cheating on her.

received a report that Mother was living with Father and Child. CYS removed Child and he was adjudicated dependent on March 10, 2010. CYS established Family Service Plan ("FSP") goals for Father and instructed him to attend all scheduled visits with Child, cooperate with CYS, and have no contact with Mother. Although Father cooperated with CYS and attended most of his scheduled visits with Child, he continued to have contact with Mother.

On February 25, 2011, CYS filed a petition for involuntary termination of parental rights against Father, Mother and unknown father of Child. The court conducted hearings on June 22, 2012, July 20, 2012, July 30, 2012, October 5, 2012, March 1, 2013, April 12, 2013, May 10, 2013, October 18, 2013, and November 22, 2013. On June 26, 2014, the court granted CYS's petition and terminated the parental rights of Mother, Father, and unknown father. On July 25, 2014, Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father raises the following issues for our review: [4]

> IS THE TRIAL COURT'S FINDING OF GROUNDS FOR INVOLUNTARY TERMINATION OF [FATHER'S] PARENTAL RIGHTS UNDER 23 PA.C.S. § 2511(A)(2), (5) AND (8) PROVEN BY A SHOWING OF CLEAR AND CONVINCING EVIDENCE?

_____

[4] We have reordered Father's issues for purposes of disposition.

IS THE TRIAL COURT'S FINDING THAT TERMINATION OF PARENTAL RIGHTS SERVES THE DEVELOPMENTAL, PHYSICAL AND EMOTIONAL NEEDS AND WELFARE OF THE CHILD PROVEN BY CLEAR AND CONVINCING EVIDENCE UNDER 23 PA.C.S. § 2511 (B)?

IS IT AN ERROR OF LAW FOR THE TRIAL COURT TO TERMINATE PARENTAL RIGHTS IN A CASE WHERE CYF HAS FAILED TO FULFILL ITS LEGAL OBLIGATION TO PROVIDE THE PARENT WITH REASONABLE EFFORTS TO PROMOTE REUNIFICATION, PRIOR TO THE FILING OF A TERMINATION PETITION?

Father's brief at 1.

In his first issue, Father argues CYS failed to present clear and convincing evidence that grounds for termination exist under subsections (2), (5) or (8) of 23 Pa.C.S. § 2511(a) because Father was meeting Child's needs upon removal, he was affirmatively participating in non-offenders' counseling, and he had made substantial progress toward alleviating the circumstances which necessitated the original placement. We disagree.

Our standard of review is as follows:

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super.2004) (citations omitted).

To affirm the termination of parental rights, this Court need only agree with any one subsection of section 2511(a), in addition to section (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super.2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa.2004).

23 Pa.C.S. § 2511 governs requests to terminate a natural parent's parental rights, and provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the

- 5 -

incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re T.F.**, 847 A.2d 738, 742 (Pa.Super.2004).

Our Supreme Court has addressed the incapacity sufficient for termination under § 2511(a)(2):

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

**In re Adoption of S.P.**, 47 A.3d 817, 827 (Pa.2012) (quoting **In re: Adoption of J.J.**, 515 A.2d 883, 891 (Pa.1986)).

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

**In re Z.P.**, 994 A.2d 1108, 1118-19 (Pa.Super.2010) (quoting **In re B.,N.M.**, 856 A.2d 847, 855 (2004), *appeal denied*, 872 A.2d 1200 (Pa.2005)).

- 7 -

Regarding termination under § 2511(a)(5) and (8):

Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 [Pa.C.S.] § 2511(a)(5). "[T]o terminate parental rights pursuant to 23 [Pa.C.S.] § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275–76 (Pa.Super.2003); 23 [Pa.C.S.] § 2511(a)(8). "Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super.2003). Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa.Super.2003); *In re Adoption of M.E.P., supra.*

*In re Z.P.*, 994 A.2d at 1118-19 (some internal citations and emphasis deleted).

Although this Court need only agree with one subsection of section 2511(a), in addition to section 2511(b) to affirm the termination of parental rights, *see In re B.L.W., supra,* the competent evidence of record supports the court's finding of grounds for termination under subsections (2), (5), and

(8) of section 2511(a). Father did not physically abuse or neglect Child, but he has shown a repeated and continued incapacity to protect Child from Mother, which provides grounds for termination under subsection (2). Additionally, Child has been removed from Father for over six (6) months, and the condition for removal, Father's contact with Mother, continues to exist. Although Father is correct that he attended counseling and did not miss many visits with Child, he failed to remedy the most dangerous condition that led to Child's removal. Despite Father's claims that he will no longer see Mother, the record reflects otherwise. Father has been with Mother for over thirty-five (35) years. He continued to see her after their parental rights to their daughters were terminated because of Mother's horrific abuse, after she stabbed him with a knife, and after being apprised that if he maintained any contact with her, his parental rights to his son would be terminated. Father has shown an incapacity to stay away from Mother that he cannot or will not remedy. Thus, grounds for termination exist under subsection (5). Further, because Child has been removed for over twelve (12) months, Father's failure to remedy the current conditions of separation at this point, regardless of his ability to possibly change in the near future, provide grounds for termination under subsection (8).

Next, Father argues that even if grounds for termination exist, involuntary termination of his parental rights would not serve the needs and welfare of Child, as required by section 2511(b). He claims that Child's

needs could only be met if he were to maintain his relationship with Father, who has exhibited good parenting skills and maintains a strong bond with Child. He concludes that the court erred by disregarding testimony about how Child would respond adversely to the termination of their close and meaningful relationship, and determining that termination of his parental rights would best serve the welfare of Child. We disagree.

Once the statutory grounds for termination have been met under section 2511(a), the court must also consider whether termination would best serve the needs and welfare of the child pursuant to section 2511(b). *In re C.L.G.*, 956 A.2d 999, 1009 (Pa.Super.2008). The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Although the Act does not specifically refer to the necessity of an evaluation of the bond between parent and child, our case law requires an evaluation of any such bond. *See In re E.M.*, 620 A.2d 481 (Pa.1993). However, this Court has held that neither statute nor precedent require a trial court to order that an expert perform a formal bonding evaluation. *In re K.K.R.-S*., 958 A.2d 529, 533 (Pa.Super.2008). This Court has explained:

> Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

> *In re C.P.,* 901 A.2d 516 (Pa.Super.2006). Moreover,
>
> > The court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. *In re Adoption of K.J.,* [936 A.2d 1128, 1134 (Pa.Super.2007)]. ... The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re C.S.,* [761 A.2d 1197 (Pa.Super.2000)]. Most importantly, adequate consideration must be given to the needs and welfare of the child. *In re J.D.W.M.,* 810 A.2d 688, 690 (Pa.Super.2002).
>
> *In re K.Z.S.,* 946 A.2d at 760.

*In re C.L.G.*, 956 A.2d 999, 1009-10 (Pa.Super.2008).

> > Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. *See* [*In re K.M.,* 53 A.3d 781, 791 (Pa.Super.2012)].
>
> > \* \* \*
>
> > [M]embers of [our Supreme] Court have opined that the existence of a pre-adoptive home is "an important factor" in termination cases. *In re R.I.S.,* 36 A.3d 567, 575 ([Pa.]2011) (Saylor, J., concurring). … "While having an identified adoptive resource is not a prerequisite for [termination of parental rights], ideally there should be a strong likelihood of an eventual adoption." Administrative Office of Pennsylvania Court's Office of Children and Families in the Courts, *Pennsylvania Dependency Benchbook* § 12.1 at 126 (2010).

*In re T.S.M.*, 71 A.3d 251, 268 (Pa.2013).

Here, the court considered the bond between Father and Child and the bond between the foster family and Child before determining that

termination of Father's parental rights served the needs and welfare of the child. The court found:

> 39. In assessing the relationship between [Child] and [Father] in conjunction with and yet bifurcating this [c]ourt's assessment of the relationship between [Child] and the foster parents, it was necessary for the [c]ourt to examine the record as a whole including history, observations, impressions, the experiences of the stakeholders and most importantly, giving deference to the findings and opinions of the [c]ourt [e]xperts offered in this case. The [c]ourt finds that both Dr. Pepe and Dr. Rosenblum concluded that [Child] had an attachment to [Father]. The County Agency caseworkers who testified at trial believe that [Father] and [Child] have a bond. Further, in the same testimony of the portion of the trial which took place on July 20, 2012[,] the County Agency caseworkers believe that the foster parents are meeting [Child's] needs and welfare as they view [Child] to be very comfortable in his foster home and bonded to his foster parents. In specifically reviewing the testimony and the opinions of the [c]ourt [e]xperts in this case concerning the interactional evaluations conducted and the individual evaluations which took place as well, Dr. Pepe conducted an interactional evaluation with then almost four (4) year old subject child and his foster parents in late 2010. She observed [Child] to have multiple attachment behaviors and believes he was building a primary attachment to the foster parents, despite evidence of him being emotionally blunted, which is a characteristic of children who have been exposed to trauma. When Dr. Pepe conducted an individual evaluation of [Child] six (6) months later, [Child] described foster parents as his primary and psychological parents and expressed feeling happy. Dr. Pepe at that time also believed that [Child] was [quite] attached to his foster sister. Dr. Pepe further believed as reported in the trial transcript of October 5, 2012 that [Child] had made developmental gains compared to the issues he had when he came into care and experiencing stability with the foster parents. Dr. Rosenblum conducted an interactional evaluation of almost five (5) year old [Child] and foster parents in late 2011. Based on the interactional evaluation, Dr. Rosenblum assessed [Child] as being "very

strongly attached" with foster parents. (See [F]ather Exhibit "C"). Dr. Rosenblum at that time saw their relationship as comfortable, secure and very trusting and believes [Child's] attachment to be primary. Dr. Rosenblum noted [Child's] attachment to his foster siblings, especially his foster sister whose name begins with an E. During the individual evaluation of [Father], [Child] was tentative about separating from foster parents initially. [Child] at that time described his foster parents as mommy and daddy. Dr. Rosenblum reported in [Father's] Exhibit C that [Child] indicated that he wanted to "I just want to stay at school, not want visit too much" and that he grew anxious about being separated from the foster parents later in the sessions, but appeared to be reassured when Dr. Rosenblum told him that they were in the next room. Notwithstanding his attachment to [Father], Dr. Pepe believes adoption by the foster parents is in [Child's] best interest due to the safety risks that [Father] poses. In the trial transcript of October 5, 2012, Dr. Rosenblum acknowledged that [Child's] relationship to the foster parents is stronger than the one he has with [Father].

\* \* \*

42. Equally abundantly clear and convincing based on the record as a whole[,] including the insightful and learned opinions of Dr. Robert Coufal that [Father's] dishonesty, deficiencies, abnormalities and lack of conscientiousness, facilitates, establishes and presents as an equivalent threat and risk to this young child's present existence and future. This [c]ourt can reasonably conclude that the imagination alone cannot envision given the extensive record in this case which the [c]ourt has reviewed carefully in support of its determination, that both [Mother] and [Father] present [to] this child, to borrow from the seminal quotation of respected Justice Oliver Wendell Holmes, a clear and present danger.

\* \* \*

45. The County Agency has proved by clear and convincing evidence, that termination of [Mother] and [Father's] parental rights serves the needs and welfare of [Child]. In

- 13 -

the home of the foster parent's care, [Child] experiences love, safety, stability and security. [Child's] strongest attachment is the positive bond he has with the foster parents and his foster siblings. The [c]ourt acknowledges that [Child] has an attachment to [Father] and discontinuing the relationship with [Father] will likely cause [Child] some level of emotional expression. However, the reality is that [Child] has been out of [Father's] care for almost four and a half years. The current situation causes [Child] confusion because he is torn between his foster parents and [Father]. Moreover, the only way to ensure [Child's] safety is to keep him out of [Father's] care. Despite all of the efforts of the County Agency in this case, to provide the necessary services, to examine [Father's] motives, and await [Father's] honesty and comprehension in a healthy and reliable way, [Child] should not languish in foster care while waiting for his [parents] to demonstrate their ability to care for him. [Child] has waited in abeyance and deserves the permanency which adoption can best offer him at this time, and therefore, it best meets the needs and welfare of the subject child to terminate the parental rights of [Mother], [Father] and the Unknown father and proceed to adoption by the foster parents.

Orphans' Court's Findings of Fact, Conclusions of Law and Order of Court ("Findings of Fact"), filed June 26, 2014, at 23-28 (pagination supplied by this Court) (internal quotation marks and citations omitted). Because the orphans' court had competent evidence to support its findings, Father's contention that the court erred in determining the termination of his parental rights would serve the needs and welfare of Child merits no relief.

In his final issue, Father contends the refusal of CYS to provide reunification efforts to Father prior to the filing of the termination petition violated his due process rights and requires reversal of the trial court's decree. Again, we disagree.

- 14 -

In *In re D.C.D.*, 105 A.3d 662 (Pa.2014), our Supreme Court held that a trial court is not required to consider an agency's provision of reasonable reunification services to a parent before deciding to terminate parental rights. Further, after Child's August 24, 2009 removal from Father, Father's FSP goals were to cooperate with CYS, attend scheduled visits with Child, and have no contact with Mother. CYS did not offer further reunification services to Father, as he had already successfully completed non-offenders' counseling and CYS did not have concerns about Father's parenting skills. CYS's major concern with Father was that he would not make the conscious decision to avoid Mother. In finding that CYS had fulfilled its obligation to Father, the court stated:

> 23. As much as [Father] engaged in visitation, deceptively cooperated with [CYS] and its providers, participated in addressing [Child's] medical needs, attended parenting classes, attended and reasonably completed parenting classes, met his mental health goals insomuch as he attended evaluations conducted by Court Experts through the Allegheny Forensic Associates, [Father's] pursuit of his FSP goals were checkered with inconsistencies, some uncooperativeness and instances of opposition and resistance. A historic overview of [Father's] participation with the services provided by [CYS] as set forth by the record as a whole, would demonstrate the patterns and history previously articulated as aforestated by the Court. This [c]ourt finds that [CYS], indeed, did provide [Father] with all necessary available services that were relevant to and germane, consistent with [CYS's] plan for reunification and the maintenance of a stable relationship between [Father] and [Child]. [CYS] did not, however, provide [Father] with any services between when [Child] was removed the second time in August 2009 and when this [c]ourt relieved the Agency of reasonable efforts to reunify

- 15 -

the family in November 2010. At this point, in the history of the case, the overall record supports that essentially there was nothing more by way of services that [CYS] could offer [Father] to facilitate reunification. A reasonable mind could conclude that [Father] was somewhat successful at pursuing his FSP goals with the exception of the one (1), which given the history of this case was the most critical for purposes of reunification and in order to meet the needs and welfare of the subject child. This particular FSP goal in which [F]ather failed terribly was based on [CYS's] grave concern which was also maintained by the [c]ourt, was not relevant to [Father's] hands-on parenting skills and provisions for [Child's] basic needs but rather, [Father's] decision making, judgment and ability to protect [Child]. [CYS] had exhausted all services that could assist father for purposes of reunification. In addition, [CYS] had also provided services in an attempt to hopefully have [Father] address this critical FSP goal of protecting [Child] from [M]other and [Father] disconnecting himself completely from [Mother]. The record indicates that [Father] had successfully completed non-offenders' counseling at the Center for Family Excellence. As a result of [Father's] deceptive and deceitful pursuit, as the record demonstrates, of his lifestyle and connect to [Mother], [CYS] maintains and remains, acknowledged by this [c]ourt, that [Father] is not capable of protecting [Child] and disconnecting himself and [Child] from [Mother].

Findings of Fact at 11-12. The record provides ample support for the court's findings of fact.

Our review of the record reveals that the orphans' court's decision to terminate Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(2), (5), (8) and (b) is supported by clear and convincing evidence, and we see no abuse of discretion.

Order affirmed.

- 16 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/29/2015